# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

JOHN W. KARCZ, JR and
JENNIFER A. KARCZ

         Plaintiffs,

   vs.

THE CITY OF NORTH TONAWANDA,
c/o Mayor Arthur G. Pappas; THE
COUNTY OF NIAGARA c/o County
Clerk Joseph A. Jastrzemski;  WILLIAM R.
LEWIS; SHAWN P. NICKERSON;
WILLIAM R. HALL; THOMAS E.
KRANTZ; ROBERT LABUSHESKY;
KAREN SMITH; TODD BUSH;
ROBERT KOLATA; JAMES
MUEHLBAUER; LAWRENCE
KUEBLER; SCOTT WILLARD;
STEPHEN ENDRES; TERRY HUEY;
LEE BOLSOVER; ROBERT
BOHNSTADT; SHAWN LARSON;
DANIEL MAHONEY; JEFF SHIESLEY;
DARYL E. TRUTY; RICHARD
WYDYSH; AND "NORTH
TONAWANDA POLICE OFFICERS
JOHN DOE I, II, III, IV, V, AND IV and
JANE DOE" of the  North Tonawanda
Police Department (NTPD); JAMES R.
VOUTOUR; SCOTT LOMBARDO;
RONALD P. DWORZANSKI; AND
NIAGARA COUNTY DRUG TASK
FORCE OFFICERS JOHN DOE I, II, III,
AND IV (NCDTF) OF THE Niagara
County Sheriff's Department (NCSD);
NIAGARA COUNTY DISTRICT
ATTORNEYS MICHAEL VIOLANTE;
LAURA T. BITTNER; and KEVIN D.
CANALI,

**Case No.: 1:16-cv-00628**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS



---

1

Civil Action No. 1:16-cv-00628

PLAINTIFFS'  OPPOSITION  TO
DEFENDANTS'  MOTION  TO  DISMISS

## PRELIMINARY STATEMENT

Plaintiffs John W. Karcz, Jr., and Jennifer A. Karcz, submit this motion of opposition to certain Defendants' Motion to Dismiss, in their official capacities, pursuant to F.R.C.P. 12(b)(6), for failure to state a claim upon which relief can be granted.

Upon reading the memorandum of law submitted by Kevin G. Cope, of Webster and Szanyi, it is readily apparent that Mr. Cope omit or attempts to misinterpret many crucial points of law and fact and bend them to his intended fabrications.

Revealingly, defense counsel attempts to tell this Court that Defendants are not guiltless individuals who did not break the laws of the land and violate the Plaintiffs' rights under the Constitution of the United States, but rather the defense believes this matter was all some sort of misunderstanding ( or "mischaracterization" page 3, line 1, of Defendant's Motion ) and should be dismissed on alleged technicalities.

However, the defense ignores that in the case at bar, this is not a question which is governed by the law or practice of the state in which the trial is had. It depends upon the power of the national courts, under the constitution and laws of the United States. The constitution, in the seventh amendment, declares that in all suits at common law, where the value in controversy shall exceed $20, trial by jury shall be preserved.

Consequently, the Defendants' deliberate omissions of a statement of guilt, as well as the continued existence of genuine issues of material fact makes clear that there continue to exist triable issues, and the Defense Motion is non-availing for the requested relief of partial dismissal.

Furthermore, Defense Attorney Cope in his dismissal motion also admits (evidently based on his own investigations) on page 2, line 23, and continuing to page 3, line 1, that there were "some incidents" where damages were caused to the Plaintiffs by the Defendants; and those damages being issue of fact, not law, can only be resolved by a trier of fact, and as such the Defendants' Motion to Dismiss must fail.

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

## PLAINTIFFS RESPONSE

The Defense will, in this response, endeavor to answer each off the untruths and/or ambiguities offered by defense counsel's alternations between attempting to testify about matters to which he has no direct or implicit knowledge or mischaracterizations of the law as applicable to this case.

The Defense seems to substantially misunderstand that the elements of a Section 1983 case are "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a "person" acting "under color" of state law. The "laws" referred to include those statutes that confer individual rights on a class of persons that include the plaintiffs. Because the purpose of Section 1983 is to vindicate federal rights, a plaintiff suing under the statute is in most circumstances not required to exhaust state procedures or remedies which would be otherwise be required prior to filing suit.

The Plaintiffs intend to show at trial, through fact and law, that the Defendants, in an official capacity, interfered with the Plaintiffs' federal rights in two distinct ways:

      A.) By enforcing state laws or policies that conflict with federal law, the Defendants deprived the Plaintiffs of federal rights. In this case, the public officials obviously acted under "color of state law."

      B.) The Defendants in an official capacity also interfered with federally-protected rights by misusing power entrusted to them under state law. In this case, these official acts under color of state law occurred when the Defendants were clothed with the authority of state law.

Finally, the defense has chosen to ignore the law of the land, which is at the very point of the federal question which brings this matter to this Court. In a very similar inquiry, nearly 130 years ago, our United States Supreme Court ruled: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. " ***Union Pacific Railway Company v. Botsford, 141 U.S. 250 (1891)***

## ARGUMENT

### 1. PLAINTIFFS CLAIMS WERE FILED TIMELY.

Defendants' unlawful actions continued on a year-after-year basis, but were seemingly based on an initiating instance which occurred under Color of Law and involved the same Defendants as well as new ones joining the conspiracy to misuse power entrusted to them under state law, which deprived the Plaintiffs of federal rights over an ongoing and continuing period of time.

#### A. Plaintiffs filed their 42 U.S.C. § 1983 claims upon accrual.

The Defense attempts to invoke the statute of limitations as a primary defense, arguing that some imaginary date of accrual took place and the Plaintiffs are time-barred because the first warrantless acts of police breeching their home by police took place three years, two months, and two weeks prior to the filing of suit. In rejecting the state's argument, the United States Court of Appeals for the Fourth Circuit agreed with the district court that the plaintiff "had alleged an ongoing constitutional violation, and that the statute [of limitations] would not have begun to run until the violation ended." Id., at *663 *(Quoting Virginia Hospital Association v. Baliles 868 F.2d 653 (4th Cir. 1989))*. The court of appeals also agreed with the district court's conclusion that "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations, Id., at *663, citing the United States Supreme Court's decision in *Brown v. Board of Education 347 U.S. 483 (1954)* for this principle. Please also see, *Palmer v. Board of Education 46 F.3d 682 (7th Cir. 1995)*.

The Plaintiffs will show evidence at trial that the information gained by the 2013 break-ins committed by the Defendants were utilized for the purpose of gaining unlawful entry into their home in June 2015. Because the acts sued for under 42 U.S.C. § 1983 could never have occurred without information and details of their home illegally achieved by the unlawful acts of the Defendants in 2013, which were used to commit later unlawful conduct.

#### B. State Law claims were timely under the law

With regard to the defense's claim for dismissal under GML § 50 (e), and (i), respectively, the Plaintiffs plan to present evidence at trial that the City of North Tonawanda's GML

§ 50-e designee; a.) unlawfully continued to be defendant Shawn Nickerson long after he left his post as City Attorney and was *appointed* as Judge of North Tonawanda, replacing defendant William Lewis, and; b.) that his (Nickerson's) secretary, Sally Hall, the wife of defendant William Hall not only received, but intercepted, interfered with, and refused to give the GML 50-e designee the Plaintiffs' Notice of Claim on two occasions. Therefore, the Plaintiffs were in full compliance with CPLR § 215; and GML § 50-i(1)(c); the mail tampering of Hall's wife notwithstanding.

Moreover, a plaintiff suing under the 42 U.S.C. § 1983 statute is in most circumstances not required to exhaust state procedures or remedies which would be otherwise required prior to filing suit. *Felder v. Casey, 487 U.S. 131 (1988)* (state claims statute); *Patsy v. Florida Board of Regents, 457 U.S. 496 (1982)* (state administrative proceeding); *McNeese v. Board of Education, 373 U.S. 668 (1963)* (state procedure for challenging school segregation); *Monroe v. Pape, 365 U.S. 167 (1971)* (no need to resort to state causes of action).

Both State and federal decisions recognize recognizes a continuing violation when a plaintiff alleges a series of "continual unlawful acts" that extends into the limitations period prior to suit. *Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981); see also Nat'l Adver. Co. v. City of Raleigh 947 F.2d 1158, 1166 (4th Cir. 1991); Perez v. Laredo Junior Colt, 706 F2d 731, 733-34 (5th Cir.1983); cf S.E.C. v. Caserta, 75 F. Supp. 2d 79, 89 (E.D.N.Y 1999)* (noting that a continuing violation exists "when a violation occurring outside the limitations period is so closely related to other violations which are not time-barred as to be viewed as part of a continuing practice for which recovery should be had for all violations"); *Day v. Moscow, 769 F. Supp. 472, 477 (S.D.N.Y 1991)* ("In order to show a continuing violation, [a] plaintiff must show 'a series of related acts, one or more of which falls within the limitations period.'" *(quoting La Beach v. Nestle Co., 658 F. Supp. 676, 687 (S.D.N.Y 1987)))*; *51 AM. JUR. 2d Limitation of Actions § 168 (2000)* ("[T]he 'continuous tort' rule. . holds that if a wrongful act is continuous or repeated, the statute of limitations runs from the date of each wrong or from the end of the continuing wrongful conduct.').

As previously discussed, the defense's contention fails as all state law claims made by the Plaintiffs accrued after May 4, 2015, making the argument all the more non-availing.

## 2. PLAINTIFFS ARE ENTITLED TO PURSUE DAMAGES FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The Plaintiffs contend they were attacked and tortured by a coalition of police, city, and county officials in May and June 2015, after Plaintiff Jennifer Karcz reported a police officer, Defendant Jeff Shiesley for insurance fraud.

Inasmuch that the defense in their motion admits that the Plaintiffs were **tortured,** under color of law, for the purpose of causing intentional and/ or reckless (negligent) infliction of emotional distress by the Defendants in revenge for Mrs. Karcz's lawful and rightful report of Police Officer Shiesley's fraudulent malingering to the New York State Department of Worker's Compensation, the Plaintiffs are entitled to sue for the damages arising therefrom as those damages arose from actions the Defendants took under Color of Law.

While the Plaintiffs did not specify the term "torture", this is clearly what was described in their claim: "torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control, and torture brought on private citizens by actors under color of law in extreme abuse of their position (committing revenge for the lawful report of a fellow officer for fraud to a state administrative agency, even if only willful, wanton or reckless behavior, in deliberate disregard of potential distress) is clearly within the parameters of the law required to pursue damages in both the Defendants official and private capacities, particularly since the Defendants used the color of law to avoid criminal prosecution.

That is to say the actions of the Defendants were: (1) that the conduct of the defendant was extreme and outrageous, in that shortly after filing the complaint against Shiesley Mrs. Karcz was held in the nude at gunpoint after police intentionally and unlawfully broke into her home; (2) that the emotional distress suffered by the plaintiff was severe, in that both Plaintiffs are under a doctor's care for medical conditions resulting from the conduct of the Defendants; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct, in that the Defendants intentionally, with planning,

and malice sought to deprive the Plaintiffs of solace and security not only within their home, but at work, school, and social settings.

The elements of a claim for intentional infliction of emotional distress are: "(I) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress" *Howell v New York Post Co., Inc., 81 NY2d 115, 121 (1993)*, all factors the Plaintiffs have previously alleged and intend to show at trial.

The Restatement (Second) of Torts states, "In particular police officers . . . have been held liable for extreme abuse of their position," the Restatement further explains, "Even in such cases, . . . the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous." *RESTATEMENT (SECOND) OF TORTS § 46 (1965).*

Also stated in the Plaintiffs tenth claim were the words "reckless infliction," which avails the Plaintiffs another claim for negligent infliction of emotional distress.

A claim of negligent infliction of emotional distress likewise relies upon allegations of conduct "so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community" *Wolkstein v Morgenstern, 275 AD2d 635, 636-637 (2000); accord Hernandez v City of New York, 255 AD2d 202, 202 (1998); Rocco v Town of Smithtown, 229 AD2d 1034, 1035 (1996), appeal dismissed 88 NY2d 1065 (1996)*. Moreover, such conduct must have either unreasonably and directly endangered the plaintiff's physical safety *see Ben-Zvi v Kronish Lieb Weiner & Hellman LLP, 278 AD2d 167, 167 (2000)* or caused the plaintiff to fear for his or her own physical safety. *See Lancellotti v Howard, 155 AD2d 588, 589-590 (1989).* This comports with the well settled principle that "[t]he circumstances under which recovery may be had for purely emotional harm are extremely limited" *(Lancellotti, 155 AD2d at 589).*

The complained of conduct in the Plaintiffs' moving papers of unlawfully holding a pregnant woman prisoner, nude, at gunpoint, in her own home, after breaking down two locked barriers as bold-faced revenge for her lawful report of a neighbor breaking the law cannot fail to be deemed "so outrageous . . . as to go beyond all possible bounds of decency" *See Harville v Lowville Cent. School*

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

*Dist., 245 AD2d 1106, 1107 (1997) at 1107; see also Poliah v Westchester County Country Club, Inc., 14 AD3d 601, 601 (2005).* Because this amazingly extreme torture took place under by actors under color of law in extreme abuse of their position, the defense argument for dismissal must fail, and this issue be preserved for hearing at trial against the Defendants in all of their capacities.

## 3. PLAINTIFFS ARE ENTITLED TO A CLAIM
## UNDER *RESPONDEAT SUPERIOR.*

At issue in the twelfth claim of this case is this case is a mixture of negligence, incompetence, and malicious behavior commenced against the Plaintiffs under color of law by police officers and supported by the official policies and customs of the City of North Tonawanda. Because the acts complained of include ongoing and repeated actions personally condoned, initiated, and participated in by the Chief of North Tonawanda's Police Department, William Hall, it is fair to draw the circumstantial inference that this behavior was supported by his (Chief Hall's) employer the City of North Tonawanda.

Particularly since William Hall, shortly after being appointed Chief of Police, personally led the group that forced entry to the Plaintiffs' home in May of 2013.

In *Monell v. Department of Social Services, 436 U.S. 658, 691 (1978)*, the Supreme Court set forth the test for municipal liability. The municipality may be liable for allegedly unconstitutional acts of a municipal employee if the plaintiff was subjected to the denial of his constitutional rights as a result of an official policy or custom. *See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995).* A municipality cannot be held liable under section 1983 solely on a theory of respondeat superior. *See 436 U.S. at 694-95.* There must be "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris, 489 U.S. 378, 385 (1989).*

Additionally, *Monell* holds that local governments may be sued for damages, as well as declaratory and injunctive relief, whenever the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, local governments may be sued for constitutional

deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's decision-making channels. ***Monell v. Department of Social Services, 436 U.S. 658, 691 (1978)***. Thus, even if we were to believe Chief Hall never got direct formal approval for the way he acted and led his employees in acting towards the Plaintiffs, the City of North Tonawanda certainly is liable for what became the repeated and customary response of violating the Plaintiffs' rights between 2013 and continuing to the present day.

In other actions filed pursuant to 42 U.S.C. § 1983, liability is imposed only on the official causing a constitutional violation. It is settled law in this circuit that in a civil rights action for monetary damages against a defendant in his individual capacity, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation. ***See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).*** The Plaintiffs clearly allege that defendant Hall participated in the incidents underlying their claims, and his leadership thereby failed to adequately discourage further constitutional violations on the part of the defendant police officers, and thus implicates the City for culpability under respondeat superior..

Since Chief Hall was as part of his employment also directly responsible for the policies, customs, and practices of those men and women he personally hired, trained and retained in employment, the repeated acts of Chief William Hall are the causal link here, and respondeat superior is a viable claim to be decided by a trier of facts at a trial.

The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment. Pursuant to this doctrine, the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment. If, however, an employee for purposes of his own departs from the line of his duty so that for the time being his acts constitute an abandonment of his service, the master is not liable.'" ***Judith M. v Sisters of Charity Hosp., 93 NY2d 932, 933 (1999.)***

One of the issues presented in this case is whether the Defendants were acting within the scope of their employment when they harmed the Plaintiffs. The Plaintiffs believe these police officers were for several reasons as summed up by the following decisions: "An employee's actions

fall within the scope of employment where the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business.' Conversely, where an employee's actions are taken for wholly personal reasons, which are not job related, his or her conduct cannot be said to fall within the scope of employment.'" *Danner-Cantalino v City of New York, 85 AD3d 709, 710 (2d Dept 2011); Kawoya v Pet Pantry Warehouse, Inc., 3 AD3d 368, 369 (1st Dept 2004.)*

"The question of whether a particular act was within the scope of employment is ordinarily one for the jury because it is so heavily dependent on factual considerations." *Petrescu v College Racquet Club, Inc., 40 AD3d 947, 949 (2d Dept 2007.)*

Whether an employee's acts fall within the scope of employment depends on " The connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one the employer could reasonably have anticipated.'" *Ramos v Jake Realty Co., 21 AD3d 744, 745 [1 Dept 2005], quoting Riviello v Waldron, 47 NY2d 297, 303 (1979.)*

With respect to respondeat superior, the defense's arguments on this motion were primarily addressed to the issue of whether Defendants acted within the scope of their employment. In order to hold a defendant liable for false arrest, the plaintiff must establish that that defendant (Defendant police, their Chief, or prosecution) actively importuned the police to make an arrest without reasonable cause to believe in the plaintiff's culpability.'" *See Rivera v County of Nassau, 83 AD3d 1032, 1033-1034 (2d Dept 2011); Du Chateau v Metro-North Commuter R.R. Co., 253 AD2d 128 (1st Dept 1999); Carrington v City of New York, 201 AD2d 525, 527 (2d Dept 1994); Donnelly v Morace, 162 AD2d 247 (1st Dept 1990.)*

Intrinsic to this case is also a 'custom and usage' question. The 'custom or usage' in question will be attributed to the government body when the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the...governing body [or policymaker with responsibility for oversight and supervision] that the practices have become customary among its employees." *Spell v. McDaniel, 824 F.2d 1380. 1387 (4th Cir. 1987). See also Britton v. Maloney,*

*901 F. Supp. 444, 450 (D. Mass. 1995)* ("Unlike a 'policy', which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it."). The plaintiffs assert that the repeated violation of their rights became a custom for many of the North Tonawanda Police officers based on "peer pressure, " "herd instinct," and an unwritten "code of silence" about other officer's violations of law which was tolerated, if not promoted by policymakers. As in *Baron v. Suffolk County Sheriff's Dep't,* 402 F.3d 225, 239 (1st Cir. 2005) ("This is not a case, then, of attributing liability to the municipality based on a single incident of isolated employee conduct. Rather, the record demonstrates a pattern of ongoing harassment that the jury could have found high-ranking Department officials were aware of and did not stop. . .. The Department was therefore not entitled to judgment as a matter of law or a new trial on the basis of insufficient evidence of the code of silence.").

The Plaintiffs hold in their complaint that certain defendants such as Chief Hall, affirmatively induced other officers to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where those officers "were not acting of their own volition.'"(but rather following the examples of their leadership) *Oszustowicz v Admiral Ins. Brokerage Corp., 49 AD3d 515, 516 (2d Dept 2008.)*

Although Plaintiffs realize the North Tonawanda Police Department supervisors named in this action are not automatically liable under section 1983 when their subordinates commit a constitutional tort. Plaintiffs intend to show supervisory liability by demonstrating one or more of the following criteria: (1) the defendants actually and directly participated in the alleged acts; (2) the defendants failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendants created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendants were grossly negligent in his supervision of the police officers who committed the constitutional violation; and (5) the defendants failed to act in response to information that unconstitutional acts were occurring. *See Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003).* In

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

addition, plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury. *See Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).*

With respect to malicious prosecution, the defendant must have "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Du Chateau, 253 AD2d at 131.* The Plaintiffs clearly and inferentially pled that the North Tonawanda defendants were at all times both part of the arresting and prosecuting "team" who repeatedly violated their civil rights.

With regard to the claim for Negligent Hiring, Supervision, and Retention "A cause of action for negligent hiring . . . is based upon the defendant's status as an employer. Such a claim requires the employer to answer for a tort committed by an employee against a third person when the employer has either hired or retained the employee with knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm.' The employer's negligence lies in his having placed the employee in a position to cause foreseeable harm, harm which would most probably have been spared the injured party had the employer taken reasonable care in making decisions respecting the hiring and retention of his employees.'"*Sandra M. v St. Luke's Roosevelt Hosp. Ctr., 33 AD3d 875, 878-879 (2d Dept 2006.)*

In *City of Oklahoma City v. Tuttle, 471 U.S. 808, 813 (1985),* a clear consensus was reached that municipal liability based on a policy of inadequate training cannot be derived from a single incident of police misconduct. But the repeated incidents which the Plaintiffs relate over several years' time significantly differentiates from *Tuttle.*

In *City of Canton v. Harris, 489 U.S. 378 (1989),* the Supreme Court addressed the questions left unresolved in *Tuttle.* In City of Canton, the plaintiff claimed a deprivation of her right to receive necessary medical care while in police custody. She asserted a claim of municipal liability for this deprivation based on a theory of "grossly inadequate training." The plaintiff presented evidence of a policy that gave police shift commanders complete discretion to make decisions as to whether prisoners were in need of medical care, accompanied by evidence that such commanders received no training or guidelines to assist in making such judgments. *Id. at 382.* The Sixth Circuit upheld the adequacy of the district court's jury instructions on the issue of municipal liability for inadequate

training, stating that the plaintiff could succeed on her failure-to-train claim " [where] the plaintiff . . . prove[s] that the municipality acted recklessly, intentionally, or with gross negligence." *Id.* In the case at bar, the Plaintiffs have alleged and defense counsel failed to disavow the repeated entries into the Plaintiffs home were in fact, reckless, intentional, and/or with gross negligence which put the Plaintiffs at risk of grave bodily harm. This assertion in itself, if proven to be true, would allow the Plaintiffs to succeed on their failure-to-train claim.

In an opinion written by Justice White in the same case, the Court unanimously rejected the City's argument that municipal liability can be imposed only where the challenged policy is itself unconstitutional and concluded that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." **Id. at 387**. Noting the substantial disagreement among the lower courts as to the level of culpability required in "failure to train" cases, the Court went on to hold that "the inadequacy of training policy may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." **Id. at 388**. The Court observed, *id.* at 390, that: *"[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury" [footnotes omitted].* The "deliberate indifference" standard has nothing to do with the level of culpability that may be required to make out the underlying constitutional wrong, but rather has to do with what is required to establish the municipal policy as the "moving force" behind the constitutional violation. **Id. at 388 n.8.** Justice O'Connor elaborated on how a plaintiff could show that a municipality was deliberately indifferent under *City of Canton.* First, where there is "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face, .... failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue." **Id. at 396** Justice O'Connor was also willing to

---

13

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

recognize that municipal liability on a "failure to train" theory might be established "where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion, ... [which pattern] could put the municipality on notice that its officers confront the particular situations on a regular basis, and that they often react in a manner contrary to constitutional requirements." *Id. at 397* (O'Connor, J., concurring). ***See also Spell v. McDaniel, 824 F.2d 1380 (4th Cir. 1987); Eddy v. City of Miami, 715 F. Supp. 1553, 1555 (S.D. Fla. 1989)*** ("A municipality's continuing failure to remedy known unconstitutional conduct of police officers is a type of informal policy or custom that is amenable to suit under § 1983.").

Finally, Chief William Hall is personally named as a defendant for *"(Hall) ...contacted or directed to be contacted at least 12 venues of publicity including the newspaper press, television news, and even online social media networks to give "press releases" with the purpose to deliberately defame (shame and slander)... Plaintiff, Mr. Karcz in the community where he, his wife, and his children are domiciled." **See Complaint, Pg. 39, Paragraph 150.*** Because conducting a press conference is not intimately associated with the judicial process, no law enforcement official is immune for statements made during a press conference.

For the forgoing reasons, the Plaintiffs Twelfth Claim for respondeat superior was properly pled, alleging a cause of action based on an official policy and procedure of the North Tonawanda Police Department to inadequately train, supervise and discipline its police officers, including the Defendants, thereby failing to adequately discourage further constitutional violations on the part of its police officers and entitles the Plaintiffs to proceed against the Defendants in their official capacities.

## 4. THE CITY ATTORNEY IS NOT ENTITLED TO IMMUNITY

The argument that North Tonawanda City Attorney Shawn P. Nickerson is entitled to absolute immunity appears be taken entirely out of context by defense counsel, in obfuscating the line between fact and fiction as well as individual and official capacities.

Two hours before the last-minute addition of Nickerson to the defense's motion herein being opposed, Nickerson was being represented by the Deputy New York State Attorney General who called one of the Plaintiffs' cellular phones which was left in their vehicle while at work requesting

for an extension to prevent Nickerson's default in this matter for failing to provide a timely answer, given the position of the caller, Plaintiffs were led to believe Nickerson was presenting a defense in his official capacity. Likewise, the fact that Nickerson is now evidently being represented by retained counsel for the City of North Tonawanda, it again appears he is seeking "official capacity" status by the motion being responded to. Yet, both affirmative defenses applied by opposing counsel reference Individual capacity.

Plaintiffs are compelled to point out, first and foremost, Nickerson never prosecuted the Plaintiffs or, upon information and belief, anyone else in his role as city attorney, therefore, defense's first argument for absolute immunity should be recognized as a ruse and rejected immediately.

North Tonawanda City Attorney Shawn P. Nickerson is named in this claim specifically for his role, under color of law, requesting an unlawful amendment to *the North Tonawanda City Code Section 96 – Vehicle and Traffic, Article VII – Terrace Parking* on July 7, 2015. The amendment requested was unique to one property in the City of North Tonawanda; Nickerson specifically singled out legally registered trailers and boats that were parked on a paved half-circle/terrace such as the one Plaintiff Jennifer Karcz owns next door to her home at 351 Daniel Drive.

When questioned as to the reasoning behind the change, Nickerson admitted to Plaintiff John Karcz that there was a singular complaint made against the Plaintiffs---that complaint being made by Defendant Police Chief William Hall, who created the cause which Shawn Nickerson, of his own volition, took up and presented to the common council, under color of law, against the Plaintiffs civil rights. This is the cause of action against Shawn Nickerson both as an individual and in his official capacity as City Attorney for North Tonawanda.

Furthermore, when the amendment was approved, it was resolved that such would become effective as law the day after publication in the official paper of North Tonawanda; as of the date the Plaintiffs filed against Nickerson, no such publication has ever taken place, and therefore the law is unenforceable, yet Nickerson personally mailed the Plaintiffs a letter threatening them with unlawfully removing their recreational trailer and boat from private property; harassing the Plaintiffs under color of law.

Even if Nickerson were some sort of "prosecutor" in other cases, this case would turn on his role and interactions with the Plaintiffs. Like judicial immunity, prosecutorial immunity is functional; it attaches only to acts intimately related to the initiation and prosecution of a criminal case. Struggling to define the boundaries of prosecutorial immunity, the Court held that a prosecutor who advised police officers on Fourth Amendment considerations in an ongoing criminal investigation performed an investigatory rather than a prosecutorial function and was, therefore, not entitled to absolute immunity ***See Burns v. Reed, 500 U.S. 478 (1991); Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).***

Additionally, a prosecutor is not entitled to absolute immunity when performing "administrative duties…that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." ***Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).***

No prosecution by Nickerson of the Karczes ever occurred, simply clearly biased official and individual misconduct and conspiracy to abuse the Plaintiffs rights under color of law on the part of Nickerson through discrimination, which is discussed below in relation to case law.

Were the Plaintiffs persecuted (under color of law)? Yes; Were they ever prosecuted? absolutely not. Even more telling about this issue is that a F.O.I.L. request to the current City Attorney shows not one single enforcement of this "law" save for the action against the Plaintiffs.

Nickerson, it was alleged by the Plaintiffs, acted in conspiracy with the North Tonawanda Chief of Police, William R. Hall, under Color of State Law, to harass and arbitrarily and capriciously deprive the Plaintiffs of their federal constitutionally protected rights to property, and the Plaintiffs had a right to be free from this violation of their rights.

Accordingly, the bizarrely mis-pled request for dismissal of Nickerson as a defendant herein must in itself be dismissed as a complete distortion of the truth filled in with some inapplicable references to a prosecutor's rights, which Nickerson never was. In the spirit of the law, however, the Plaintiffs will present the following responses in opposition to the motion to dismiss:

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

**A. The City Attorney is Not Entitled to Absolute Immunity as His Actions Were Undertaken for Personal Reasons and his Actions Violated the Plaintiffs Civil Rights.**

As stated in the complaint, prior to the Plaintiffs' buying the property at 351 Daniel Drive, Robert Brennan, a personal friend of North Tonawanda City Attorney Shawn P. Nickerson, parked his personal vehicles and/or trailers in the same location for many years with impunity from harassment, questioning, and certainly no tickets being produced, despite Brennan not owning the property. Nickerson's attempt to threaten the Plaintiffs with an unpublished and otherwise unenforced parking ban against the Plaintiffs without due process of law, clearly constituted a violation of the Plaintiffs' civil rights.

In relevant part, the Fourteenth Amendment prohibits any state from depriving "any person of life, liberty, or property, without due process of law." Claims under this provision have been a staple of Section 1983 legal practice for many years. Procedural due process addresses the right to notice and hearing before (or after) particular deprivations can take place. Substantive due process concerns governmental deprivations of life, liberty, or property stemming from particularly outrageous governmental actions. The Supreme Court has developed a number of guidelines on the use of Section 1983 to raise claims founded on alleged deprivations of due process, beginning with an analysis of interests protected by due process.

In ***Board of Regents v. Roth***, the Supreme Court defined the property interest protected by the Fourteenth Amendment as a "legitimate claim of entitlement" to the item or benefit in question. ***Board of Regents v. Roth, 408 U.S. 564, 577 (1972).*** Such "entitlements" are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." ***Id.***

Although "a mere 'expectancy'" is not protected by due process, the Court held that the aggrieved party "must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of the 'policies and practices of the institution.'" ***Id. at 602, 603 (citation omitted).*** Some cases have held that the expectation of receiving a benefit can be a property interest

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

which supports a due process claim when the state deprives the potential plaintiff of a procedure to vindicate that expectation. In ***Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982),*** a property interest was found in the expectation that the state would provide a procedure for determining a plaintiff's disability discrimination claim. However, procedures alone and not tied to tangible benefits, are not property rights. ***Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005).*** In that case, the Court held that no property right inheres in something that the government provides or takes away at its discretion; the difference here is that the Plaintiffs purchased their "expectancy" and were not given anything discretionally.

Once the Plaintiffs purchased the property next door to them for the express purpose of parking, and this was confirmed lawful by Mr. Robert Sondel, the Assistant City Attorney for North Tonawanda the Plaintiffs were clearly conferred an expectation to property rights to park vehicles, boats, and trailers on the paved area on the property they now owned.

Fundamental liberty interests, however, are limited to those that are "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [they] were sacrificed," or that are "deeply rooted in this Nation's history and tradition." ***Bowers v. Hardwick, 478 U.S. 186, 191-92 (1986) quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937) and Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977)).***

Procedural due process generally requires that governmental deprivations of life, liberty or property be accompanied by notice and hearing. he test for determining the extent of the procedures required in a given case, including the right to a pre-deprivation hearing, balances three factors:First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. ***Mathews v. Eldridge, 424 U.S. 319, 335 (1976). See Wilkinson v. Austin, 545 U.S. 209, 226-29 (2005) (emphasizing role of notice and "fair opportunity for rebuttal" in reducing risk of erroneous deprivation).***

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

Once Nickerson, acted in conspiracy with the North Tonawanda Chief of Police, William R. Hall, under Color of State Law, to harass and arbitrarily and capriciously deprive the Plaintiffs of their federal constitutionally protected rights to liberty, property, and due process, by committing an intentionally discriminatory or retaliatory act *See generally Reeves v. Sanderson Plumbing Products, Incorporated , 530 U.S. 133, 141 (2000); McDonnell Douglas Corporation v. Green, 411 U.S. 792, 804-5 (1973); Peterson v. Scott County, 406 F.3d 515 (8th Cir. 2005) (sex discrimination); Akins v. Fulton County, 420 F.3d 1293 (11th Cir. 2005) (retaliation); Kinney v. Weaver, 367 F.3d 337 (5th Cir. 2004) (retaliation);* his (Nickerson's) actions gave rise to a claim under Section 1983 for which there is no immunity, absolute or otherwise, and as such the defense's theory fails scrutiny.

## B. The City Attorney is Not Entitled to 11th Amendment Immunity.

Primordially, the defense theory of City Attorney Shawn Nickerson's 11th Amendment immunity rests on the intentional distortion of facts by defense counsel that Mr. Nickerson acted as "a prosecutor." As previously stated, Nickerson never prosecuted the Plaintiffs for anything, in point of fact, Nickerson's role as City Attorney was never even remotely related to prosecutorial duties. Therefore, there is no relationship to the laws cited in defense counsel's moving papers and Shawn Nickerson's interactions with the Plaintiffs.

However, long-standing case law provides that if defense counsel's false claims were in any way true, Nickerson and his employer, the City of North Tonawanda are in no way entitled to 11th Amendment immunity from a lawsuit under 42 U.S.C. § 1983.

For nearly 130 years courts have held political subdivisions of the state have no Eleventh Amendment protection from suit in federal court. *Moor v. County of Alameda, 411 U.S. 693, 717-21 (1973). See also Northern Ins. Co. of New York v. Chatham County, Ga., 126 S. Ct. 1689, 1693 (2006)* ("A consequence of this Court's recognition of preratification sovereignty as the source of immunity from suit is that only States and arms of the State possess immunity from suits authorized by federal law. . . Accordingly, this Court has repeatedly refused to extend sovereign immunity to counties. *Citing Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440*

*U.S. 391, 401 (1979); Workman v. New York City, 179 U.S. 552, 565 (1900); Lincoln County v. Luning, 133 U.S. 529, 530 (1890)] See also Jinks v. Richland County, 538 U.S. 456, 466, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003)* ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit"). This is true even when, as respondent alleges here, 'such entities exercise a "slice of state power."' *Lake Country Estates, supra, at 401, 99 S.Ct. 1171.").*

Furthermore, a state court may not refuse to entertain a § 1983 action against a school board on the ground that common law sovereign immunity barred the suit. *Howlett v. Rose, 496 U.S. 356, 110 S. Ct. 2430 (1990). See also Martinez v. California, 444 U.S. 277, 284 (1980)* ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law.").

Similarly to the false claim made by defense counsel, a Circuit Court in Ohio considered the issue for an "arm" of the local courts being entitled to 11th Amendment protections. *Cash v. Hamilton County Dept. of Adult Probation, 388 F.3d 539, 545 (6th Cir. 2004)* ("The County argues that it is entitled to Eleventh Amendment immunity from suit because the Hamilton County Department of Adult Probation is an arm of the common pleas and municipal courts of the state of Ohio. To support this contention, the County cites a number of Ohio statutes. . . . The bald assertion that the Department is an arm of the common pleas and municipal courts is insufficient by itself to garner Eleventh Amendment immunity. . . Rather, this argument is one of many factors that must be considered by the district court. We have recognized that the most important factor is 'will a State pay if the defendant loses?'). A similar conclusion was had when the District Attorney's Office claimed 11[th] Amendment protection in *Hudson v. City of New Orleans, 174 F.3d 677, 683 (5th Cir. 1999)* ("Ultimately, we are most persuaded by the fact that the state treasury will in all likelihood be left untouched if damages were to be levied against the Orleans Parish District Attorney's office. It is well established that this . . . factor is crucial to our Eleventh Amendment arm of the state analysis. . . . In sum, we conclude that the Orleans Parish District Attorney's office is not protected from suit in federal court by the Eleventh Amendment."); *Harter v. Vernon, 101 F.3d 334, 340 (4th Cir. 1996)* ("In sum, when determining if an officer or entity enjoys Eleventh Amendment immunity a court must first establish whether the state treasury will be affected by the law suit. If the answer is yes, the

officer or entity is immune under the Eleventh Amendment."). *But see Sales v. Grant, 224 F.3d 293, 298 (4th Cir. 2000)* (concluding that a promise of indemnification does not alter the non-immune status of state officers sued in their individual capacities).

### 4. THE PLAINTIFFS' OFFICIAL CAPACITY CLAIMS ARE NOT DISMISSABLE FOR LEGAL REDUNDANCY

To the argument of defense counsel's assertions in his fifth point, the Plaintiffs aver that they believe the official capacity claims were correctly pled. It is hornbook law that the availability of relief against an officer in his official capacity is separate and distinct from the availability of relief against that officer in his personal capacity.

As the Fourth Circuit has held, under the "legal fiction" of a government official having "two separate identities"—official capacity and individual capacity—the two capacities "are not in privity." *Brooks v. Arthur, 626 F.3d 194, 201–02 (4th Cir. 2010).* This is because "the litigation landscape is materially different in a personal-capacity suit—as opposed to an official-capacity-suit." *Id.* "'[D]ifferent legal theories of liability are required for the plaintiff, and different defenses are available to the defendant, in a personal-capacity action than in an official-capacity action.'" *Id. (quoting Andrew v. Daw, 201 F.3d 521, 525 (4th Cir. 2000)).* Indeed, sovereign immunity may be available to shield an official in his official capacity because "'a judgment against a public servant in 'his official capacity' imposes liability on the entity that he represents,'" *Kentucky v. Graham, 473 U.S. 159, 169 (1985) (quoting Brandon v. Holt, 469 U.S. 464, 471 (1985)),* As a result, the Plaintiffs are entitled under the law to access, and potentially overcome the "high bar" in two distinct areas of culpability, and to hold two different entities responsible for the events that brought them to this Court action against the Defendants, who likewise, have two exclusive sets of defenses available to them.

In *Kentucky v. Graham, 473 U.S. 159, 168 (1985),* for example, the plaintiffs prevailed in a personal-capacity suit under *42 U.S.C. § 1983* against a state official for depriving them of their constitutional rights under the color of state law. They then sought attorneys' fees from the State,

even though the State had been dismissed from the suit on Eleventh Amendment immunity grounds. The Supreme Court held that "a suit against a government official in his or her personal capacity cannot lead to imposition of fee liability upon the governmental entity." *Id. at 167*. This is so because "[a] victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him," and "unless a distinct cause of action is asserted against the entity, the entity is not even a party to a personal-capacity lawsuit." *Id. at 167–68 (emphasis added).* Similarly, and in accordance, the Plaintiffs herein have pled for relief in discrete and non-duplicative claims against both the City of North Tonawanda and certain individual employees.

Consequently, the Plaintiffs seek permission to proceed against official entities, as pled, in the limited contexts in which the Supreme Court has implied a cause of action for damages against officials under color of law in both official and individual capacity.

## 6. THE PLAINTIFFS ARE NOT SEEKING PUNITIVE DAMAGES AGAINST THE CITY.

Plaintiffs are not seeking punitive damages against the City in accordance with decisions such as *Smith v. Wade, 461 U.S. 30 (1983)*, and *City of Newport v. Fact Concerts, 453 U.S. 247 (1981)* which declared local governments are immune from punitive damages. Nevertheless, in other decisions it is not unheard of for the city to be involved in an amicable resolution, and to state a blanket claim that: "Plaintiffs cannot collect punitive damages against the City," this early in the matter at bar seems to be idle tub-thumping from defense counsel. For example, of the Plaintiffs' position, there are numerous cases where plaintiffs have, in fact, collected punitive damages from a municipality for various reasons. "City of Newport does not establish a federal policy prohibiting a city from paying punitive damages when the city finds its employees to have acted without malice and when the city deems it in its own best interest to pay." *See Cornwell v. City of Riverside, 896 F.2d 398, 399 (9th Cir. 1990), cert. denied, 497 U.S. 1026 (1990).. See also Trevino v. Gates, 99 F.3d 911, 921 (9th Cir. 1996)* ("Councilmembers' vote to pay punitive damages does not amount to

ratification [of constitutional violation]."). Plaintiffs being non-attorneys will seek permission to modify their claim, accordingly, to more conspicuously reflect spirit and letter of the law.

### 7. THE PLAINTIFFS COMPLAINT IS SPECIFIC AS TO CONSTITUTIONAL VIOLATIONS BY INDIVIDUALS AND GROUPED ONLY TO SHOW BOTH CONTINUING VIOLATIONS AND PATTERNS AND CUSTOMS OF BEHAVIOR.

Plaintiffs are aware that the Federal Rules of Civil Practice require a plaintiff to provide sufficient notice of the claims asserted against the defendants. Rule 8(a)(2) provides that a complaint "must contain" "a short and plain statement of the claim showing that the pleader is entitled to relief." In their complaint, Plaintiffs assert that they correctly provided the court and the parties notice of the transactions or occurrences intended to be proved together with the material elements of the plaintiff's cause of action.

In the paragraphs between 6 and 222 of their complaint, Plaintiffs clearly set forth fair notice of what the specific instances, offenses, omissions, and constitutional violations were the causes for action as well as the individuals known and unknown who committed those acts, and in paragraphs 223-269 Plaintiffs set forth the grounds upon which their claim rests.

It has been written that in order to survive a Motion to Dismiss for Failure to State a Claim under *Fed.R.Civ.P. 12(b)(6)*, the pleadings must satisfy *Fed.R.Civ.P. 8(a)(2)*; "A pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) does not require detailed factual allegations. A party is obligated to provide greater detail than simple labels, conclusions, or recitations of the elements needed for a cause of action. *See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).* The Plaintiffs aver that in their complaint included many such instances of "short and plain statement of the claim showing that the pleader is entitled to relief."

The pleading must suggest that the allegation is plausible, not just possible. Yet, the pleadings do not have to demonstrate probability; just enough factual information to create an expectation that discovery will uncover evidence supporting the claim. *Id. at 556.* The pleading must "nudge claims

across the line from conceivable to plausible" in order to survive a 12(b)(6) motion. *Id. at 570*. When looking at the allegations for purposes of a motion to dismiss, the Court must accept all claims in the pleadings as true, except legal conclusions. *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).* The factual allegations cannot be mere conclusory statements.

If the Court agrees with the Defendants' attorney on point VII, then the Plaintiffs would seek opportunity to amend the complaint to conform with sufficiency under Rule 8(a)(2), in accordance with other decisions on the matters argued herein.

However, "[t]he settled rule is that 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Flores v. S. Peru Copper Corp., 343 F.3d 140, 148 (2d Cir. 2003) (quoting Conley v. Gibson, 355 U.S. 41, 45–46 (1957)).* Generally, the court will afford a pro se plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas, 480 F.3d at 639 (internal quotation marks omitted).* But leave to amend pleadings may be denied when any amendment would be futile. *See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993)* ("Where itappears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.").

The Plaintiffs bring this action under 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton, 126 F.3d 400, 405 (2d. Cir. 1997) (citing Eagleston v. Guido, 41 F.3d 865, 875-76 (2d Cir.1994)).*

In evaluating the complaint, the court must accept all factual allegations as true and must draw all inferences in the plaintiff's favor. *See Scott v. Harris, 550 U.S. 372, 378 (2007); Larkin v. Savage, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); King v. Simpson, 189 F.3d 284, 287 (2d Cir. 1999).* Although "a court is obliged to construe [pro se] pleadings liberally, particularly when theyallege civil rights violations," *McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004),* even

pleadings submitted pro se must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. ***Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004).*** "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" ***Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (internal quotation marks and citation omitted); see also Boykin v. Keycorp, 521 F.3d 202, 213 (2d Cir 2008)*** (discussing pleading standard in pro se cases after Twombly: "even In evaluating the complaint, the court must accept all factual allegations as true and must draw all inferences in the plaintiff's favor. ***See Larkin v. Savage, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); King v. Simpson, 189 F.3d 284, 287 (2d Cir. 1999).***

Although "a court is obliged to construe [pro se] pleadings liberally, particularly when they allege civil rights violations," ***McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)***, even pleadings submitted pro se must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. ***Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004).*** "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" ***Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007))(internal quotation marks and citation omitted); see also Boykin v. Keycorp, 521 F.3d 202, 213 (2d Cir 2008)*** (discussing pleading standard in pro se cases after Twombly: "even after Twombly, dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases.").

The Plaintiffs ask the Court to rule that the allegations of the complaint, liberally construed and presumed true for purposes of examination, are sufficient at this stage of the litigation to allow the claims to proceed. ***See, e.g., McEachin v. McGuiniss, 357 F.3d 197, 200 (2d Cir. 2004)*** But if the complaint is decided to be lacking in specificity, Plaintiffs seek leave to amend their complaint.

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs humbly pray the Court will deny the Defendants' motion to dismiss in its entirety and grant such other and further relief as this Court deems equitable. In the alternative, Plaintiffs seek leave to amend their complaint.

Date: June 10, 2019

John W. Karcz, Jr.

Jennifer A. Karcz

Return Mail Address:

357 Daniel Drive

North Tonawanda, N.Y. 14120

Civil Action No. 1:16-cv-00628

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS



UNITED STATES
POSTAL SERVICE®



# PRIORITY
# MAIL

**PRIORITY®**
★ MAIL ★



**FROM:**

John W. Karez
Jennifer A. K
357 Daniel
N. Tonawand

**TO:**

Clerk of the C
Hon. Lawren
United States
2 Niagara S
Buffalo, NY



P S 0 0 0 0 1 0 0 0 0 1 4

**EP14F Oct 20** Label 228, March 2016
**OD: 12 1/2 x 9 1/2**

**FOR DOMEST**

✱ **Domestic only.** ✱ **For Domestic shipments, the maximum weight is 70 lbs. For International shipments, th**



- WDNY

1 3 2019

UFFALO

**TRACKED***

**UNITED STATES POSTAL SERVICE.**   *Retail*

**P**   **US POSTAGE PAID**
**$7.35**   Origin: 15108
06/11/19
4116600226-35

**PRIORITY MAIL 2-Day ®**

0 Lb 7.50 Oz

**1004**

EXPECTED DELIVERY DAY:  06/13/19

**C030**

SHIP
TO:
   2 NIAGARA SQ
   BUFFALO NY  14202-3350

**USPS TRACKING NUMBER**

9505 5135 5348 9162 3354 20

**UNITED STATES POSTAL SERVICE ®**
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES O

, Jr  and

arez

Drive

NY 14120

ourt  for

e J. Vilardo

District Court

quare

14202

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

C AND INTERNATIONAL USE

e maximum weight is 4 lbs.